# United States Court of Appeals for the Federal Circuit

---

**PRIMESOURCE BUILDING PRODUCTS, INC.,**
*Plaintiff-Appellee*

v.

**UNITED STATES, JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, GINA M. RAIMONDO, SECRETARY OF COMMERCE, CHRISTOPHER MAGNUS, COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE,**
*Defendants-Appellants*

---

2021-2066

---

Appeal from the United States Court of International Trade in No. 1:20-cv-00032-TCS-JCG-MMB, Senior Judge Timothy C. Stanceu, Judge Jennifer Choe-Groves, Judge M. Miller Baker.

-------------------------------------------------

**OMAN FASTENERS, LLC, HUTTIG BUILDING PRODUCTS, INC., HUTTIG, INC.,**
*Plaintiffs-Appellees*

v.

**UNITED STATES, JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE, GINA M. RAIMONDO, SECRETARY OF COMMERCE,**
*Defendants-Appellants*

———————

2021-2252

———————

Appeal from the United States Court of International Trade in Nos. 1:20-cv-00037-TCS-JCG-MMB, 1:20-cv-00045-TCS-JCG-MMB, Senior Judge Timothy C. Stanceu, Judge Jennifer Choe-Groves, Judge M. Miller Baker.

———————

Decided: February 7, 2023

———————

JEFFREY S. GRIMSON, Mowry & Grimson, PLLC, Washington, DC, argued for plaintiff-appellee PrimeSource Building Products, Inc. Also represented by BRYAN PATRICK CENKO, JILL CRAMER, KRISTIN HEIM MOWRY, SARAH WYSS.

ANDREW CARIDAS, Perkins Coie, LLP, Washington, DC, argued for plaintiffs-appellees Oman Fasteners, LLC, Huttig Building Products, Inc., Huttig, Inc. Also represented by MICHAEL PAUL HOUSE; KARL J. WORSHAM, Phoenix, AZ.

MEEN GEU OH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellants. Also represented by KYLE SHANE BECKRICH, BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY.

ADAM H. GORDON, The Bristol Group PLLC, Washington, DC, for amicus curiae The American Steel Nail Coalition. Also represented by LAUREN FRAID, JENNIFER MICHELE SMITH.

_____

Before TARANTO, CHEN, and STOLL, *Circuit Judges*.

TARANTO, *Circuit Judge*.

In 2018, pursuant to § 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877, codified as amended at 19 U.S.C. § 1862, the Secretary of Commerce reported to the President that steel imports threatened national security by contributing to unsustainably low levels of use of domestic steel-producing capacity, and the President, agreeing with the Secretary's finding, issued Proclamation 9705 to adopt a plan of action to address that threat, starting with imposition of higher tariffs on steel imports from certain countries but providing for monitoring and future adjustments if needed. In 2020, the President issued Proclamation 9980, which, based on the required monitoring, raised tariffs on imports of steel derivatives such as nails and fasteners. That proclamation was challenged in two cases (before us here) filed in the Court of International Trade (Trade Court)—one by PrimeSource Building Products, Inc.; the other by Oman Fasteners, LLC, Huttig Building Products, Inc., and Huttig, Inc. (collectively, Oman Fasteners)—against the United States, the President, and two federal agencies and their heads (collectively, the government). The Trade Court held Proclamation 9980 to be unauthorized by § 232 because the new derivatives tariffs were imposed after the passing of certain deadlines for presidential action set forth in § 232. *See PrimeSource Building Products, Inc. v. United States*, 497 F. Supp. 3d 1333 (Ct. Int'l Trade 2021); *PrimeSource Building Products, Inc. v. United States*, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021); *Oman Fasteners,*

*LLC v. United States*, 520 F. Supp. 3d 1332 (Ct. Int'l Trade 2021).

The government appeals. After the Trade Court issued its decisions on the merits, we decided *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 1414 (2022), which led the Trade Court to issue stays of its judgments in the two cases. In *Transpacific*, we upheld a presidential proclamation that increased tariffs on steel beyond Proclamation 9705's rate, concluding that when the President, within the § 232 time limits at issue, adopts a plan of action that contemplates future contingency-dependent modifications, those time limits do not preclude the President from later adding to the initial import impositions in order to carry out the plan to help achieve the originally stated national-security objective where the underlying findings and objective have not grown stale. We now uphold Proclamation 9980. That proclamation's new imposition reaches imports of steel derivatives, which are within § 232's authorization of presidential action based on the Secretary's finding about imports of steel, and there is no staleness or other persuasive reason for overriding the President's judgment that including derivatives helps achieve the specific, original national-security objective. We therefore reverse the judgments of the Trade Court.

I

A

Section 232 "empowers and directs the President to act to alleviate threats to national security from imports." *Id.* at 1311. For the President to act, the Secretary of Commerce must, under § 232(b), first investigate the effects on national security of imports of an article and submit to the President within 270 days a report detailing the Secretary's findings about such effects. 19 U.S.C. § 1862(b)(1)(A)–(3)(A). The report must contain the Secretary's recommendations for action or inaction with respect

to imports of that article. *Id.* § 1862(b)(3)(A). If the Secretary finds that imports of the article "threaten to impair the national security, the Secretary shall so advise the President in [the] report." *Id.* Under § 232(c), within 90 days of receiving the Secretary's report, the President must determine whether to concur in that finding. *Id.* § 1862(c)(1)(A)(i). If the President concurs in that finding, then within the same 90 days "the President shall" also "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article *and its derivatives* so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(1)(A) (emphasis added). If the President determines to take action with respect to the import of the article and its derivatives, "the President shall implement that action" within 15 days of the foregoing determinations, *id.* § 1862(c)(1)(B), that is, within 105 days of the Secretary's report.

B

In 2017, the Secretary began investigating steel imports and concluded that they posed a threat to national security. J.A. 232–35. On January 11, 2018, the Secretary reported to the President that the imports were "weakening our internal economy" and harming "the [domestic] steel industry," the continued vitality of which "is essential for national security applications." *Id.* The Secretary recommended that the President "take immediate action by adjusting the level of these imports through quotas or tariffs" with the goal of "reducing import penetration rates to approximately 21 percent," so that "U.S. industry would be able to operate at 80 percent of their capacity utilization." J.A. 236, 288. The 80 percent rate, the Secretary found, was the minimum "necessary to sustain adequate profitability and continued capital investment, research and development, and workforce enhancement in the steel sector" and to thereby "enable U.S. steel mills to increase operations significantly in the short-term and improve the

financial viability of the industry over the long-term." J.A. 234, 289.

On March 8, 2018, the President announced his concurrence and remedial plan. Proclamation 9705: Adjusting Imports of Steel into the United States, 83 Fed. Reg. 11,625 (Mar. 8, 2018). He concurred that "steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security." *Id.* ¶ 5, 83 Fed. Reg. at 11,626. He imposed a 25 percent tariff on imports of various steel articles (*e.g.*, flat-rolled products, bars and rods, tubes, pipes, and ingots) from many countries. *Id.* ¶ 8, clause 2, Annex, 83 Fed. Reg. at 11,626–29; *see PrimeSource*, 497 F. Supp. 3d at 1337–38 n.2. The President deemed this an "important first step in ensuring the economic viability of our domestic steel industry." Proclamation 9705 ¶ 11, 83 Fed. Reg. at 11,626; *id.* clause 2, 83 Fed. Reg. at 11,627. He retained the option to "remove or modify" the impositions if the United States and other countries were to come up with suitable alternatives for remedying the security threat. *Id.* ¶ 9, 83 Fed. Reg. at 11,626. More generally, the President directed the Secretary to "continue to monitor imports of steel articles," "review the status of such imports with respect to the national security," and "inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under section 232." *Id.* clause 5(b), 83 Fed. Reg. at 11,628.

In light of, *e.g.*, negotiations between the United States government and some foreign governments, the President issued a variety of follow-up proclamations to make changes in the impositions of Proclamation 9705, including the August 2018 Proclamation 9772 that was challenged (and upheld by this court) in *Transpacific*. 4 F.4th at 1314–16. The Secretary monitored relevant imports, as required, and in January 2020, the President issued a new proclamation—now covering *derivatives* of the earlier-covered

steel articles—based on information supplied by the Secretary. Proclamation 9980: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States, 85 Fed. Reg. 5281 (Jan. 24, 2020).[1]

The President recited that the Secretary had informed him that "domestic steel producers' capacity utilization ha[d] not stabilized for an extended period of time at or above the 80 percent capacity utilization level" that was the objective of Proclamation 9705. *Id.* ¶ 5, 85 Fed. Reg. at 5281. The Secretary stated that "imports of certain derivatives of steel articles have significantly increased since the imposition of the tariffs," and "[t]he net effect of the increase of imports of these derivatives has been to erode the customer base for U.S. producers of . . . steel and undermine the purpose of the proclamations adjusting imports of . . . steel articles to remove the threatened impairment of the national security." *Id.* ¶ 5, 85 Fed. Reg. at 5282. The Secretary characterized this increase in imports of steel derivatives as "circumvent[ing] the duties on . . . steel articles imposed in . . . Proclamation 9705" and "threaten[ing] to undermine the actions taken to address the risk to the national security of the United States found in . . . Proclamation 9705." *Id.* ¶ 8, 85 Fed. Reg. at 5282. The Secretary "assessed that reducing imports of the derivative articles" at issue "would reduce circumvention and facilitate the adjustment of imports that . . . Proclamation 9705, as amended, made to increase domestic capacity utilization to address the threatened impairment of the national security of the United States." *Id.* Accepting the foregoing determinations by the Secretary, the President in Proclamation 9980 extended the 25 percent tariff to certain steel derivatives, including nails, staples, and tacks. *Id.* clause 1,

---

[1] The new proclamation covered derivatives of aluminum as well as steel articles, but only the steel aspects of the proclamation are at issue before us.

Annex II, 85 Fed. Reg. at 5283, 5290–92; *see PrimeSource*, 497 F. Supp. 3d at 1338–39 n.3. He "concluded that it [was] necessary and appropriate" to extend the tariffs to the specified steel derivatives "to address circumvention . . . and to remove the threatened impairment of the national security." Proclamation 9980 ¶ 9, 85 Fed. Reg. at 5283.

C

PrimeSource and Oman Fasteners, which import steel nails and fasteners covered by Proclamation 9980, brought suit in the Trade Court to challenge the proclamation. As relevant now, they contended that the proclamation's extension of the increased tariff to derivatives was contrary to § 232 because it occurred in January 2020, more than 105 days after the President received the Secretary's report. The Trade Court agreed.

The Trade Court in the PrimeSource case concluded that the 90-day and 15-day limits found in § 232(c) apply to the President's imposition of increased burdens on imports under the provision, including modifications of an earlier plan of action that had been timely adopted. 497 F. Supp. 3d at 1343–59. The court held that, insofar as the January 2020 Proclamation 9980 relied on the Secretary's January 2018 report on steel articles to satisfy the § 232(b) prerequisite to presidential action, it was untimely under § 232(c). *Id.* When the government stipulated that it was relying solely on that report to satisfy the § 232(b) prerequisite, the Trade Court held Proclamation 9980 invalid and entered final judgment against the government. *PrimeSource*, 505 F. Supp. 3d at 1353–58. The Trade Court reached the same result in the Oman Fasteners case. 520 F. Supp. 3d at 1335–39.

In both cases, the government timely appealed and also moved for at least a partial stay of the judgment pending appeal. The Trade Court granted stays, reflecting the government's newly enhanced chance of success on the merits in light of the intervening decision of this court in

*Transpacific*. *See PrimeSource Building Products, Inc. v. United States*, 535 F. Supp. 3d 1327, 1329–36 (Ct. Int'l Trade 2021); *Oman Fasteners, LLC v. United States*, 542 F. Supp. 3d 1399, 1403–09 (Ct. Int'l Trade 2021). The Trade Court did, however, note two distinctions of these cases from *Transpacific*—these cases involve an extension to derivatives of a tariff initially imposed on the articles whose importation was found to threaten national security, not (as in *Transpacific*) an increase in rate of the initial tariff on the same articles; and the time from Secretary report to challenged proclamation is much larger than in *Transpacific* (two years versus seven months). *See PrimeSource*, 535 F. Supp. 3d at 1332–33; *Oman Fasteners*, 542 F. Supp. 3d at 1403–05. We have jurisdiction over the Trade Court's final judgments under 28 U.S.C. § 1295(a)(5).[2]

II

On appeal, the government maintains that the Trade Court's decisions are incorrect in light of *Transpacific*. Appellees defend the Trade Court's decisions, asserting that factual differences render *Transpacific* inapplicable and that the government's reading of § 232 would run afoul of the delegation doctrine.

---

[2]  In *Transpacific*, we flagged the question of whether the claims against the President, as a defendant, must be dismissed. 4 F.4th at 1318 n.5; *accord PrimeSource,* 497 F. Supp. 3d at 1361–62, 1365–70 (Baker, J., concurring in part and dissenting in part). That question arises here as well. Based on our recent precedent, we hold that the claims against the President must be dismissed, but given the presence of the other defendants, we have jurisdiction to review the Trade Court's decisions on the merits. *See USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 (Fed. Cir. 2022).

We review the Trade Court's interpretation of the statute de novo. *GPX International Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015). To the extent relevant here, we may review an allegation that the President acted in violation of the Constitution. *USP Holdings*, 36 F.4th at 1365. For an asserted statutory violation, review is also available, but it is limited: "For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985). This court has repeatedly relied on the *Maple Leaf* formulation to indicate the "limited" scope of review of non-constitutional challenges to presidential action. *USP Holdings*, 36 F.4th at 1365–66 & n.3 (discussing "limited" scope, quoting *Maple Leaf*, and also quoting formulations approving review of whether "the President clearly misconstrued his statutory authority" and "whether the President has violated an explicit statutory mandate" (cleaned up)); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018).

A

In *Transpacific*, we addressed whether § 232(c)(1) "permits the President to announce a continuing course of action within the statutory time period and then modify the initial implementing steps in line with the announced plan of action by adding impositions on imports to achieve the stated implementation objective." 4 F.4th at 1318–19. We concluded that the President may do so, explaining:

> [T]he best reading of the statutory text of § 1862, understood in context and in light of the evident purpose of the statute and the history of predecessor enactments and their implementation, is that the authority of the President includes authority to adopt and carry out a plan of action that allows adjustments of specific measures, including by

> increasing import restrictions, in carrying out the plan over time.

*Id.* at 1319. And we upheld application of that authority to an increase in impositions that could have been adopted initially under § 232(c) where the President had initially announced a plan of action and later found that an increase would help solve the specific capacity-utilization problem that was the basis for the finding that imports threatened national security. *Id.* at 1310, 1332–33.

Proclamation 9980 comes within the interpretation of § 232 we adopted in *Transpacific*. The initial proclamation (Proclamation 9705) is the same here as in *Transpacific*. As described above, that proclamation rested on the Secretary's finding that imports of steel articles were threatening national security by impairing achievement of an 80 percent capacity utilization level found important for domestic steel makers to sustain their operations to meet national-security needs. J.A. 232–36, 288–89; *see* Proclamation 9705 ¶¶ 2, 4–5, 83 Fed. Reg. at 11,625–26. Proclamation 9705 announced a continuing plan of action aimed at achieving that goal, with monitoring and notice of possible changes in the future. *Id.* ¶¶ 9, 11, clauses 2, 5(b), 83 Fed. Reg. at 11,626–28 (stating that the President "may remove or modify the restriction on steel articles imports," characterizing "the tariff imposed by this proclamation [a]s an important first step in ensuring the economic viability of our domestic steel industry," and directing the Secretary to "continue to monitor imports of steel articles" and to "inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under section 232"). Later, the Secretary informed the President that a significant increase had occurred in imports of steel derivatives, which in simple economic terms constituted a circumvention of the protections initially adopted to enhance and stabilize domestic steel-making capacity utilization, undermining the effectiveness of the President's previous tariffs. Proclamation

9980 ¶¶ 5, 8, 85 Fed. Reg. at 5281–82. In response, the President extended Proclamation 9705's tariffs to various steel derivative products to address the circumvention threatening the capacity-utilization objective. *Id.* ¶ 9, clause 1, Annex II, 85 Fed. Reg. at 5283, 5290–92.

Thus, the President, having "announce[d] a continuing course of action within the statutory time period" (Proclamation 9705), "modif[ied] the initial implementing steps . . . by adding impositions on imports" (extending the tariffs to derivatives in Proclamation 9980) "in line with the announced plan of action" (Proclamation 9705's directive to the Secretary to monitor imports and inform the President of any relevant changes) "to achieve the stated implementation objective" (long-term stabilization of the capacity utilization rate at or above 80 percent). *Transpacific*, 4 F.4th at 1318–19. An imposition on imports of derivatives of the articles that were the subject of the Secretary's threat finding is expressly authorized as an available remedy by § 232(c). In acting to close a loophole exploited by steel-derivatives importers, the President was making a "contingency-dependent choice[] that [is] a commonplace feature of plans of action," *id.* at 1321, adding use of a tool that he could have used in the initial set of measures and later found important to address a specific form of circumvention Congress recognized when it authorized coverage of derivatives of the articles whose imports the Secretary found to threaten national security. *See* Oral Arg. at 25:03–26:20 (agreeing that the mechanism linking Proclamation 9980 to Proclamation 9705—foreign steel producers, facing raised tariffs on direct imports, sold steel to foreign derivatives makers not (yet) subject to raised tariffs, impairing market opportunities of domestic steel makers—"is not complicated").

B

The attempts by PrimeSource and Oman Fasteners to distinguish *Transpacific* to reach a different result here are

unpersuasive. First, the fact that the Secretary's 2018 report and Proclamation 9705 did not address the effect of imports of derivatives is immaterial. The President may take action against derivative products regardless of whether the Secretary has investigated and reported on such derivatives. *See* 19 U.S.C. § 1862(b) (stating that the Secretary's investigation and report focus on an "article"); *id.* § 1862(c)(1)(A)(ii) (empowering the President to then adjust imports of both "the article and its derivatives"). There is no textual basis for reading § 232 as empowering the President to do so only at the initial plan-adoption stage, not at later, modification stages. And what we recognized in *Transpacific* as serving the "evident purpose" of § 232—permitting the President to act under an announced plan to adjust initial measures over time to reach the initially adopted objective, 4 F.4th at 1323—applies not only to an increase in tariff rates on the same entries but equally to an extension to derivatives of measures initially imposed only on the underlying articles.

Second, the greater gap in time between the Secretary's finding and the challenged proclamation (here, nearly two years; in *Transpacific*, seven months) does not render *Transpacific* inapplicable. There is no textual basis for a specific time limit on adjustments under a timely adopted plan. Indeed, impositions under § 232 have on numerous occasions been modified many years after they were first adopted. *Id.* at 1326–29.

As we noted in *Transpacific*, a different question might be presented where the underlying finding or objective has become substantively stale; here, as in *Transpacific*, we have no occasion to address that issue, because "there is no genuine concern about staleness." *Id.* at 1332. Proclamation 9980 was issued in pursuit of the same goal first articulated in Proclamation 9705 (extended stabilization at 80 percent of domestic capacity utilization) and in response to the "current information" provided to the President by the Secretary under the "requirements for monitoring the

import reductions" that were "put in place" by Proclamation 9705. *Id.* at 1332 n.10. And insofar as appellees fault the President for imposing tariffs on some derivatives but not others, and the government for declining to put into the record the updated data the Secretary conveyed to the President, *see* PrimeSource Br. 31–32; Oman Fasteners Br. 38 & n.15, the criticism is meritless. The information at issue is not part of a legally required and legally consequential decision of the Secretary, *cf. USP Holdings*, 36 F.4th at 1366–67, and so we may not second-guess the facts found and measures taken by the President to support his adjustment, *see Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984) (citing *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940)); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); Oral Arg. at 13:45–16:00 (acknowledging that there is no review of the President's pertinent factual and remedial-appropriateness determinations).

C

Reading § 232 to permit the President to modify an initial plan of action to include derivatives, as he did here, does not render it an unconstitutional delegation. The Supreme Court has already rejected a delegation-doctrine challenge to § 232 (in an earlier form), holding that the "clear preconditions to Presidential action" established by § 232, *e.g.*, a finding by the Secretary regarding the existence of a national-security threat, and consideration by the President of "a series of specific factors," make that authority "far from unbounded." *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 558–60 (1976) (citations omitted). The same is true today, as those "clear preconditions" remain in effect, *id.*, and the President must still consider the statutory factors and act only upon receipt of a report from the Secretary, even if the President possesses the modification authority at issue here, *see* 19 U.S.C. § 1862(b)–(d). Moreover, if § 232 "easily fulfill[ed] th[e] [intelligible principle] test" in 1976, *Algonquin*, 426

U.S. at 559, it also does so now, given that the 1988 amendments, in adding the present deadlines, further defined the congressional delegation of authority to the President. We have rejected the contention that *Algonquin* does not require rejection of a delegation-doctrine challenge to § 232 in its current form. *Transpacific*, 4 F.4th at 1332–33 (citing *American Institute for International Steel, Inc. v. United States*, 806 F. App'x 982, 983–91 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 133 (2020)); *see also USP Holdings*, 36 F.4th at 1365. We see no basis for concluding otherwise here.

### III

In sum, § 232's deadlines did not prevent the President from modifying his initial timely adopted plan of action by issuing Proclamation 9980, and that conclusion does not render § 232 unconstitutional under the delegation doctrine. Because there are no more facts for the Trade Court to find on remand if *Transpacific* controls, as appellees agreed, Oral Arg. at 23:20–25, we reverse the judgments of the Trade Court and remand the cases for entry of judgment against PrimeSource and Oman Fasteners, including dismissal of the claims against the President.

The parties shall bear their own costs.

**REVERSED AND REMANDED**